[No. D045050. Fourth Dist., Div. One. Feb. 15, 2005.]

In re ELIJAH V., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
ARMANDO P., Defendant and Appellant.

COUNSEL

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Linda M. Fabian, under appointment by the Court of Appeal, for Minor.

OPINION

HUFFMAN, P. J.—Armando P. appeals an order denying him services to reunify with his biological son, Elijah V., and finding Jesse V. is Elijah's conclusively presumed father. Armando asserts his right to due process of law was violated when he was not allowed to establish paternity under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*); the court erred by not weighing competing policy factors in Family Code section 7611[1] when it determined Jesse was Elijah's presumed father; the court should not have found Jesse was conclusively presumed to be Elijah's presumed father under section 7540; Armando's right to equal protection under the Fourteenth Amendment of the United States Constitution was violated when the court denied him reunification services based on his status as a biological father; and the court should have offered him reunification services because doing so was in Elijah's best interests. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

Jesse married Michelle V. in September 2001 in Texas. The next month, they moved to San Diego. On November 12, the same day the Navy deployed Jesse, they had sexual relations. One week later, Michelle had sexual relations with Armando.

---

[1] All statutory references are to the Family Code unless otherwise specified.

Jesse returned from deployment in May 2002. Shortly thereafter, he physically abused Michelle and the Navy ordered him to take anger management classes. While he did so, Michelle went to Texas to live with her mother. Armando helped her drive to Texas and stayed with her in her mother's home. Elijah was born in August 2002 and Jesse was listed on the birth certificate as his father.

After Michelle's mother said Elijah looked like Jesse, Armando did not want to be involved with him. Michelle, however, sought to confirm paternity and asked Armando to take a blood test. Testing revealed a 90 percent probability that Armando was Elijah's father, but he took no legal action to establish paternity. Michelle also had asked him to leave her mother's home, presumably because of his disinterest in Elijah, and he moved to Denver, Colorado. Michelle reconciled with Jesse and returned to San Diego.

By 2004, Armando had moved to Phoenix, Arizona. In June of that year, while Jesse was again deployed, Michelle took Elijah and his sibling, 10-month-old Christian V., to Phoenix so she could go to school there. She made arrangements with Armando to pay his rent in exchange for his watching her children while she went to school. Several days later, she noticed a bruise that looked like a handprint on Christian's face. When she later noticed he was bleeding from his ear, she took him to the Naval Medical Center in San Diego. Doctors determined the injury was "more-likely-than-not" nonaccidental trauma. Consequently, the San Diego County Health and Human Services Agency (the Agency) removed 22-month-old Elijah from Michelle's custody and filed a Welfare and Institutions Code section 300 petition on his behalf.[2] Armando was identified on the petition as Elijah's alleged father. At the detention hearing, the court amended the petition to add Jesse as a presumed father. Elijah was subsequently detained with him.

At the August 2004 jurisdictional and dispositional hearing, the court made a true finding on the petition, declared Elijah to be a dependent, and placed him with Jesse. The court found Jesse was Elijah's conclusively presumed father under section 7540 and Armando was the child's biological father, but not his presumed father. The court also denied Armando's requests for services and visitation.

---

[2] Christian was also removed and a petition filed on his behalf, but he is not at issue in this appeal.

## DISCUSSION

### I

Armando contends the court denied him substantive due process when it did not find he was a father within the meaning of *Kelsey S.*, *supra*, 1 Cal.4th 816.

### A

The Agency asserts Armando has waived his right to complain the court did not find he was a father under *Kelsey S.* because he did not make a request to be so declared at the hearing. We agree.

A parent's failure to raise an issue in the juvenile court prevents him or her from presenting the issue to the appellate court. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338–1339 [63 Cal.Rptr.2d 562].) Because Armando did not ask the court to find he was a father within the meaning of *Kelsey S.*, he has waived his right to raise the issue here.

Armando asserts he sufficiently raised the issue of whether he was a *Kelsey S.* father by arguing he was entitled to presumed father status and reunification services. We disagree. The issue in *Kelsey S.* is whether the man demonstrated he made "a full commitment to his parental responsibilities—emotional, financial, and otherwise" and was prevented from taking the child into his home by a third party. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) At the hearing, however, Armando focused on facts that he claimed demonstrated he was a presumed father within the meaning of section 7611, subdivision (d). We note there is some overlap in the factors used to establish a man as a presumed father under that section and to establish a man as a father within the meaning of *Kelsey S.* Consequently, a party seeking status as a father under *Kelsey S.* must be clear he wants to be so declared. Because Armando did not specifically address the *Kelsey S.* factors or make any request at the hearing to be designated a *Kelsey S.* father and focused on his status as a presumed father within the meaning of section 7611, subdivision (d), the court had no reason to believe he wanted to be designated a father under *Kelsey S.* He is barred from raising the issue as error here.

### B

Even if Armando had not waived his right to argue that he was entitled to be declared a *Kelsey S.* father, he has not established his substantive due process rights were violated because the evidence shows he was not a father within the meaning of *Kelsey S.*

A biological father may be accorded parental rights and become a *Kelsey S.* father when his attempt to achieve presumed parent status under section 7611, subdivision (d) is thwarted by a third party and he made "a full commitment to his parental responsibilities—emotional, financial, and otherwise." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849; see *In re Sarah C.* (1992) 8 Cal.App.4th 964, 972 [11 Cal.Rptr.2d 414].) We consider his conduct before and after the child's birth, including whether he publicly acknowledged paternity, paid pregnancy and birth expenses commensurate with his ability to do so, and promptly took legal action to obtain custody of the child. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) He must demonstrate a full commitment to his parental responsibilities within a short time after he learned that the biological mother was pregnant with his child. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1060 [43 Cal.Rptr.2d 445, 898 P.2d 891].) He must also demonstrate a willingness to assume full custody. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)

Armando made no such showing. At most, the evidence showed he sent diapers for one year and, on one occasion, $300. He offered no evidence that he was unable to make further financial contributions. The only person he told he was Elijah's father was his mother, and she did not believe he acted parentally. There was no evidence he publicly acknowledged Elijah was his child and when his paternity was questioned, he became uninterested in the child. Further, at most, he lived with Elijah for two weeks in Michelle's mother's home after Elijah's birth and in his own home for 11 days in 2004. His role in 2004 was that of a babysitter, not a parent. He never moved to San Diego to try and parent the child. He never claimed he was willing to take full custody; to the contrary, he said he was in "no position" to take Elijah and that placing the child with him would constitute "abuse." These facts are insufficient to establish fatherhood within the meaning of *Kelsey S.* (*In re Sarah C.*, *supra*, 8 Cal.App.4th at pp. 972–973 [acknowledging the child as his to a few friends and family and caring for the child for a few months is insufficient to establish fatherhood within the meaning of *Kelsey S.* when the father never sought to be listed on the birth certificate, never completed any paperwork with his employer to have the child named as a dependent or an insurance beneficiary, never provided a home for the child, contributed money for rent or food only once, and lived with the child only briefly in the mother's home].)

To demonstrate a full commitment to his parental responsibilities, Armando was also required to take prompt legal action to seek custody. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) However, he never took legal action to seek custody or to establish paternity, despite knowing shortly after Elijah's birth that there was a 90 percent probability he was the child's father. He never obtained a judgment of paternity or sought to be on the birth certificate.

Armando asserts that he should be considered a *Kelsey S.* father because Michelle did not let him see Elijah. However, because he did not fully commit to his parental responsibilities, her actions in this regard are irrelevant. In any event, the record does not demonstrate she kept him from fully assuming parental responsibilities. Although she admitted she did not allow him to see Elijah at times, it appears he asked to see the child on only two occasions, which does not demonstrate a wish to be a parent. In any event, we question whether Michelle actually prevented Armando from seeing the child. She kept in contact with Armando because he was Elijah's biological father. She allowed him to take care of the child while she was at school. There is no evidence Armando traveled to San Diego to see Elijah but Michelle would not let him see the child.

Armando also complains the Agency prevented him from establishing himself as a *Kelsey S.* father. However, the Agency did not become involved in Elijah's life until he was 22 months old and did not prevent Armando from establishing a meaningful parental relationship with the child before that time. Armando has not suffered a substantive due process violation by not being declared to be a father within the meaning of *Kelsey S.*

## II

Armando argues the court erred when it declared Jesse to be a conclusively presumed father under section 7540 without balancing the competing presumptions in section 7611 or allowing him to testify.

Section 7611 provides several ways in which a man may achieve presumed father status. When there are two men who qualify as presumed fathers under section 7611, the court considers which presumption is "founded on weightier considerations of policy and logic," and that presumption controls. (§ 7612, subd. (b).) Here, Jesse qualified as a presumed father under section 7611, subdivision (a), which provides "[h]e and the child's natural mother are or have been married to each other and the child is born during the marriage . . . ."

The only provision of section 7611 that possibly applies to Armando is subdivision (d), which states he "receives the child into his home and openly holds out the child as his natural child." However, Armando did not establish that he received Elijah into his home or openly held him out as his natural child. As discussed above, he took the child into his home for only 11 days and did so as a babysitter rather than a parent. Michelle and Armando were not establishing a family unit because Michelle intended to pay his rent in exchange for his babysitting services and considered herself to be a guest in his home. She was upset when he disciplined Elijah, believing he did not

have the right to do so. Further, he told only one person he was Elijah's father and that person did not believe he acted parentally. He never publicly acknowledged paternity. Consequently, Armando was not a presumed father within the meaning of section 7611, subdivision (d) and there were no competing presumptions for the court to balance.

Armando implies the court deprived him of the opportunity to establish himself as a presumed father under section 7611, subdivision (d) or as a father within the meaning of *Kelsey S.* by denying his counsel's request for a continuance. The juvenile court may continue a dependency hearing at a parent's request for good cause shown. (Welf. & Inst. Code, § 352, subd. (a); Cal. Rules of Court, rule 1422(a)(2).) Courts have interpreted this policy to be an express discouragement of continuances. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 179 [6 Cal.Rptr.3d 205].) The court's denial of a request for a continuance will not be overturned on appeal absent an abuse of discretion. (*Id.* at p. 180.)

Here, Armando was living in Phoenix. Although he had notice of the jurisdictional and dispositional hearing, he chose not to personally appear. His counsel told him he needed to be available to testify if necessary during the hearing, but he was not available when counsel attempted to telephone him. Counsel offered the court no reason why Armando was not available. Because Armando did not demonstrate good cause for a continuance, the court did not abuse its discretion in denying it.

### III

### A

Armando argues the court erred in finding Jesse was conclusively presumed to be Elijah's father under section 7540 because he was not the child's biological father.

Under section 7540 "the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage" except as provided in section 7541. Section 7541, subdivision (a) provides that "[n]otwithstanding Section 7540, if the court finds that the conclusions of all the experts, as disclosed by the evidence based on blood tests . . . are that the husband is not the father of the child, the question of paternity of the husband shall be resolved accordingly."

However, the only parties who may seek blood tests under section 7541 are the husband, the child, or a man who is a presumed father within the meaning of section 7611. (§ 7541, subd. (b).) Thus, when a man who is not a

presumed father within the meaning of section 7611 seeks to establish his paternity, the trial court may not order blood tests under section 7541 to defeat the conclusive presumption in section 7540. (*Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 239–240 [71 Cal.Rptr.2d 399].) This is because biological paternity is not a relevant factor in determining presumed father status under section 7611. (*In re Raphael P.* (2002) 97 Cal.App.4th 716, 735 [118 Cal.Rptr.2d 610].) Thus, "it is irrelevant that the biological father can prove his paternity or even that all parties to the proceedings may concede that [he] is the biological father." (*Rodney F. v. Karen M., supra,* 61 Cal.App.4th at p. 240.) Because Armando is not a presumed father within the meaning of section 7611, the court erred by ordering blood tests and had to apply the conclusive presumption in section 7540.[3]

B

Armando asserts the court erred in applying the conclusive presumption of section 7540 because Jesse and Michelle were not actually cohabitating at the time of Elijah's conception.

■ To qualify as a conclusively presumed father under section 7540, a man must be living with his wife at the time the child is conceived. (*Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1203 [92 Cal.Rptr.2d 294].) Thus, the presumption has not been applied when the child was born too soon after a man and wife began living together or too long after they were no longer living together. (*Id.* at p. 1204.) Similarly, the presumption is not applied where there has been no substantive cohabitation. (See *Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1115 [39 Cal.Rptr.2d 535] [separated wife's weekend tryst with husband away from their respective residences was not enough to constitute cohabitation for purposes of the presumption]; *Comino v. Kelley* (1994) 25 Cal.App.4th 678, 681, 684 [30 Cal.Rptr.2d 728] [marriage was a business relationship; the parties did not have a sexual relationship]; *City and County of San Francisco v. Strahlendorf* (1992) 7 Cal.App.4th 1911, 1914–1915 [9 Cal.Rptr.2d 817] [husband and wife had not met at time of conception].)

Armando alleges the record shows that Michelle and Jesse were not living together when Elijah was conceived because Jesse was deployed. Because

---

[3] Neither section 7551 nor *In re Raphael P., supra,* 97 Cal.App.4th 716, relied on by Armando, compel a different conclusion. Section 7551 provides that a court may, on its own motion, order paternity testing in a civil action or proceeding in which "paternity is a relevant fact." Here, paternity would become a relevant fact only if there is no conclusively presumed father. Because Jesse was a conclusively presumed father, paternity was not at issue and the court had no need to order blood tests.

The issue in *In re Raphael P., supra,* 97 Cal.App.4th at pages 723–736, was whether the presumption of section 7611, subdivision (d) could be rebutted by genetic testing showing the man is not the biological father. That is also not the issue here.

they were not physically living in the same home, he asserts the "laws of nature" barred the application of the conclusive presumption. However, Jesse and Michelle had sexual relations on November 12, 2001, the date doctors originally believed she had conceived. They were cohabitating that day because they were living in Jesse's military housing. Further, the average period of gestation is between 270 and 282 days. (*Whitney v. Whitney* (1959) 169 Cal.App.2d 209, 214 [337 P.2d 219].) Elijah was born 276 days after Jesse and Michelle had sexual relations. Thus, because Jesse and Michelle had sexual relations on the day doctors originally believed Elijah was conceived and the child was born within 276 days of the parents' last physical cohabitation, they were cohabitating within the meaning of section 7540. The court properly found Jesse was Elijah's presumed father within the meaning of section 7540.

## IV

### A

Armando asserts his right to equal protection under the Fourteenth Amendment of the United States Constitution was violated because he was denied reunification services under Welfare and Institutions Code section 361.5, subdivision (a) on the ground that he was only a biological father, but Michelle was entitled to services by virtue of her status as the child's biological mother.

■ Under the equal protection clause, the Legislature may not enact statutes that "draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective." (*Lehr v. Robertson* (1983) 463 U.S. 248, 265 [77 L.Ed.2d 614, 103 S.Ct. 2985].) "[I]t may not subject men and women to disparate treatment when there is no substantial relation between the disparity and an important state purpose." (*Id.* at p. 266.)

■ However, persons are entitled to equal protection under the Fourteenth Amendment only when they are similarly situated. (*People v. Carrillo* (1984) 162 Cal.App.3d 585, 593 [208 Cal.Rptr. 684].) When a biological father has never had continuous custodial responsibility for his child and has not established any custodial, personal, or financial relationship with the child, the equal protection clause does not prevent the state from treating the mother and father differently. (*Lehr v. Robertson, supra*, 463 U.S. at pp. 267–268.) In *Lehr*, the United States Supreme Court held that a man who did not appear on the child's birth certificate, had taken no legal action to establish paternity until adoption proceedings had begun, had not lived with the child after birth, had not provided the mother or child with any financial

support, and had never offered to marry the mother, could be treated differently than the mother without violating the equal protection clause because he never established a substantial relationship with the child. (*Id.* at pp. 252, 266–268.)

■ Like the man in *Lehr*, Armando had, at best, a superficial relationship with Elijah. He had lived with the child in Michelle's mother's home for approximately two weeks and had the child in his home for only 11 days. The latter occurred only because Michelle wanted to go to school where he lived and needed him to babysit. He sent token financial support only once, was not listed on the child's birth certificate, and took no legal action to have himself declared the father or to seek custody. He never initiated legal proceedings to obtain visits. He acknowledged to only one person that he was the child's father. Elijah did not view Armando as his father. Thus, as was the case in *Lehr*, it was appropriate for the court to treat Armando differently than Michelle because he never established a substantial relationship with the child. Simply stated, "[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." (*Lehr v. Robertson, supra,* 463 U.S. at p. 260, italics omitted.)

■ Armando relies on *In re Jerry P.* (2002) 95 Cal.App.4th 793 [116 Cal. Rptr. 2d 123] for the proposition that section 7611 and the related dependency scheme violates the equal protection clause to the extent they allow a third party to unilaterally preclude a father from becoming a presumed father. However, as discussed *ante*, Armando, unlike the father in *In re Jerry P.*, was not precluded by a third party from becoming a presumed father. Also, unlike the father in *In re Jerry P.*, Armando had not committed to his parental responsibilities. Consequently, *In re Jerry P.* does not aid him. Because Armando was not similarly situated to Michelle, Welfare and Institutions Code section 361.5, subdivision (a) does not violate the equal protection clause of the Fourteenth Amendment.[4]

B

Armando contends the court abused its discretion by not granting him services under Welfare and Institutions Code section 361.5, subdivision (a).

---

[4] Our analysis might be different if there were evidence showing Michelle had not been acting as the custodial parent. However, because there is no such evidence in our record, we need not address it because it is unnecessary to our decision. (See *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65 [195 P.2d 1].)

A biological father may receive reunification services only if the court finds that granting him services would benefit the child. (Welf. & Inst. Code, § 361.5, subd. (a).) Armando's only argument as to why it was in the child's best interests was that he could build a parent-child relationship with Armando. He cites no authority that the opportunity to develop such relationship is in the child's best interests, particularly when the child has a parental relationship with another man.[5]

Armando also cites no authority that the court may order services for the biological father when a conclusively presumed father exists. We believe the court may not do so. The purpose of services is to resolve the problems that led to the dependency and thereby reunify the family. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362 [52 Cal.Rptr.2d 474].) When the child has been parented by a man who has acted in the paternal role regardless of biological paternity and that man is married to the child's mother, it is that familial relationship the court seeks to protect, not the nonexistent relationship of the man who may be the child's biological father, but has never acted in a parental role. (*Rodney F. v. Karen M., supra,* 61 Cal.App.4th at p. 239.) When the biological father has not parented the child and there is a conclusively presumed father who has, it is that man who should receive services because the child's best interests are served by being reunified with the person who has acted in a parental role, not the person who claims paternity by virtue of only a biological tie.

In any event, the record did not support a grant of reunification services or visits. Armando admitted it would "be abuse" to place Elijah with him and said he was in "no position" to take custody of the child. If he could not take the child, there was no reason to give him services. (See, e.g., *Robert L. v. Superior Court* (1996) 45 Cal.App.4th 619, 628 [53 Cal.Rptr.2d 41] [a noncustodial parent who does not seek custody is not entitled to services].) Further, the Agency believed it would be detrimental to place Elijah with Armando because he was being investigated for child abuse, had no relationship with Elijah, and stated he could not care for the child. Armando offered no contrary expert evidence. The court did not abuse its discretion in declining to grant services or visitation to Armando.

---

[5] Jesse was committed to parenting Elijah knowing he was not the biological father. He wanted to adopt him. He was on his birth certificate. He told anyone he knew he was the father, referred to Elijah in public as his son, and supported him since before his birth. Elijah received military benefits through Jesse and was the beneficiary on Jesse's life insurance.

## DISPOSITION

The order is affirmed.

Aaron, J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 8, 2005.