Filed 11/4/15 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Adoption of T.K., a Minor. | |
| H.B. et al., | G050676 |
| Plaintiffs and Respondents, | (Super. Ct. Nos. 13P001806 & 13AD000334) |
| v. | |
| D.N., | ORDER DENYING REHEARING AND MODIFYING OPINION; NO CHANGE IN JUDGMENT |
| Defendant and Appellant; | |
| K.K., | |
| Defendant and Respondent. | |

The petition for rehearing is DENIED.

The opinion filed October 7, 2015, is hereby modified in the following particulars:

1. On page 2 of the slip opinion, paragraph 2 of the Introduction, after the sentence that reads "He even falsified his check book register to make it look like he had sent money to her when he had not." insert this footnote:

"[fn]In a petition for rehearing, D.N. disputes this depiction of his financial efforts, arguing he made a number of payments toward K.K.'s expenses, including putting money into a PayPal account and sending her checks. The problem is, the trial court was very explicit in finding D.N. to be totally lacking in credibility in financial matters. We quote from the trial court's statement of decision: "Both [K.K.] and [D.N.] testified at length and both attempted to provide some context to certain e-communications, and during the trial, [D.N.] presented himself as being emotionally, financially, and physically supportive, as allowed by [K.K.]. [D.N.] claimed that within the limits and boundaries established by [K.K.], he was supportive, . . . . enough-so to qualify as a presumed father. *In general and after viewing the width and breadth of his testimony, [D.N.] was not credible; in some instances, the court drew the inference his testimony was intended more to mislead than to inform. In other instances, his testimony was not truthful*." (Italics added.) The trial court's finding means that D.N.'s own testimony as to what he proffered is unreliable."

2. On page 5 of the slip opinion, in the first paragraph of Part B, omit the sentence that currently reads: "On appeal D.N. makes no effort to show he paid for any significant portion of those amounts despite having had a job since June 21."

3. On page 6 of the slip opinion, paragraph 4, the sentence that currently reads "He would later send an email to them falsely claiming K.K. had used cocaine, marijuana and alcohol during her pregnancy." should be changed to read: "He would later send an email to them claiming K.K. had used cocaine, marijuana and alcohol during her pregnancy, claims which he later admitted to the trial court were exaggerated."

4. On page 9 of the slip opinion, in what is now footnote 4 (and what will be after the above modification footnote 5) insert this sentence at the end of the footnote: "As noted, the trial court specifically found D.N.'s financial evidence to be unreliable."

5. On page 15 of the slip opinion, first full paragraph, after the sentence that is "Indeed, comparing the facts in *Michael H.* with those in *H.R.*, it seems to us that

in *Michael H.* there was a far stronger case for *Kelsey S.* fatherhood than in *H.R.*, but the father lost in that case." insert this footnote:

"ᶠⁿ*Michael H.* in fact reflects a strong rejection of a general "balancing" approach that would excuse less than full financial and emotional commitments. In *Michael H.*, the trial court used a balancing approach to find that the father *did* qualify under *Kelsey S.*, and the appellate court used a balancing approach to uphold the trial court's conclusion. After all, the father had a lot of factors going for him. (*Michael H., supra*, 10 Cal.4th at pp. 1053-1054.) But the Supreme Court reversed based on a single point showing less than full emotional commitment, namely the fact the father did not come forward to support his fatherhood promptly enough. (*Id*. at p. 1060.) If the Supreme Court in *Michael H.* had thought balancing was the appropriate approach, it seems to us the judgment would have been affirmed rather than reversed."

These modifications do not affect the judgment.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.

3

Filed 10/7/15 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Adoption of T.K., a Minor. | |
| | |
| H.B. et al., | |
| Plaintiffs and Respondents, | G050676 |
| v. | (Super. Ct. Nos. 13P001806 & 13AD000334) |
| D.N., | |
| Defendant and Appellant; | O P I N I O N |
| K.K., | |
| Defendant and Respondent. | |

Appeal from an order of the Superior Court of Orange County, James L. Waltz, Judge.  Affirmed.

Marsha F. Lavine and Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Douglas R. Donnelly for Plaintiffs and Respondents H.B. et al.

Michelle L. Jarvis, under appointment by the Court of Appeal, and Nicole Williams for Defendant and Respondent K.K.

No appearance for the Minor.

## I.  INTRODUCTION

In *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*), the Supreme Court declared California's statutory scheme precluding paternal rights for unwed fathers unconstitutional in one – but only one – situation:  If applied to "an unwed father who has sufficiently and timely demonstrated a *full commitment* to his parental responsibilities." (*Id*. at pp. 849-850, italics added.)  From the precise language used by the court in *Kelsey S.* and as demonstrated by the holding in the later Supreme Court case of *Adoption of Michael H.* (1995) 10 Cal.4th 1043 (*Michael H.*), there are *at least* two elements of "full commitment":  (1) a demonstration of a willingness to financially support the child and (2) a willingness – at least to the extent she makes possible – to emotionally support the unwed mother during her pregnancy.

Here, we uphold the trial court's conclusion appellant D.N. did not demonstrate the full commitment required to establish either the financial or emotional elements.  He did not pay any of the mother's (K.K.'s) substantial pregnancy expenses. He did not, as was within his power, save up for the future expenses of supporting a child.  In fact, he raided the small fund the couple initially established for child expenses and never paid it back.  He even falsified his check book register to make it look like he had sent money to her when he had not.  As to emotional support, during the pregnancy D.N. engaged in a campaign of cyber-stalking K.K. that in some instances bordered on the downright creepy (creepy is K.K.'s word, not ours, but it seems apt).  He showed up at a medical appointment he would not have known about unless he had hacked into her cell phone.  When she had an appointment with an attorney to discuss this adoption case, D.N. just happened to email the attorney at the moment that appointment commenced.

2

He also used contact information from K.K.'s cell phone to try to block the adoption by the prospective adoptive parents, H.B. and C.B (the B.'s).

Given the lack of a full financial commitment and the *negative* emotional effect of the cyber-stalking during pregnancy, we cannot say the trial court erred in concluding D.N. does not qualify as a "*Kelsey S.* father." Accordingly, we affirm the order terminating D.N.'s parental rights and freeing T.K. for adoption by the B.'s.

## II.  FACTS

The record is large.  At trial, the prospective adoptive parents, the B.'s, pulled out all the stops in their effort to show that D.N. did not merit the status of a "*Kelsey S.* father." The record thus contains personal details about K.K. and D.N.'s relationship leading up to and during the pregnancy the world does not need to know. But with a little self-restraint, we can limit our rendition of the facts to the parts that are relevant.   Because the trial court's judgment may be upheld on the bases of D.N.'s less-than-full commitment financially, plus the negative emotional effects of cyber-stalking, our statement of facts will be largely confined to those two areas.[1]  And because conflicts in the evidence are resolved in favor of the judgment, they are resolved here against D.N. (See *Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717 (*Arthur M.*).)

A.  *Financial Side of the Relationship, Phase One:*

*Events Until the August 8, 2013 Final Breakup*

K.K. and D.N. began dating in June 2012.  By February or March 2013 the relationship had progressed to the point that they decided to conceive a child together. But at that time D.N. was unemployed and had no fixed address.  It would be a distortion to say he was "homeless," but he certainly was gathering no moss.  He was sleeping at

---

[1]        The trial court added "sexual demands" made by D.N. on K.K. during the early stages of K.K.'s pregnancy as a reason D.N. did not qualify as a *Kelsey S.* father.  For the sake primarily of *K.K.'s* privacy, we see no reason to perpetuate in a published opinion the salacious and embarrassing details supporting that finding.  Suffice to say that D.N.'s inadequate financial commitment and cyber-stalking are enough to support affirmance of the trial court's determination and this opinion should not be read as relying on more.

3

friends' homes, his grandmother's place in San Diego, and even sometimes in K.K.'s car parked on the street.

For her part, K.K. lived at her parents' home and worked as a receptionist in a dental office. With the mutual decision to become pregnant, K.K. immediately prodded D.N. to get a job. Soon she lamented in a text message that he was doing nothing to find employment.

Their child, T.K., was born in late January 2014. Working back nine months suggests the child was conceived in late April 2013. K.K. tested positive for pregnancy on May 20, 2013. Sadly, the couple had broken up the day before.

The news of the pregnancy prompted a reconciliation. Still, K.K. was none too impressed with D.N.'s financial efforts up to that point. Among her first communications to D.N. upon receiving news of the pregnancy was another request he get a job.

K.K. endeavored assiduously to instill in D.N. a sense of urgency about employment. On May 29, she noted he was not making an effort to find work, and told him to "grow up." She expressed the same sentiment on June 5, and made the point he had now had four months to get a job but had not. She stressed that his finding employment was no luxury. In a message dated June 6, 2013, she said "I can't afford these bills already for my health," and reiterated her disappointment D.N. was still not working.

Two weeks later, on June 21, 2013, he found a job, as a car salesman. The couple set up a "baby fund" and D.N. made a $200 deposit. But he withdrew $160 of that on August 1. There is nothing in the record or his briefing to indicate he ever restored the money. Indeed, when he did not have $200 he said was necessary for a dental cleaning in July, he borrowed the money from K.K. That money, like the baby fund, would never be paid back.

4

D.N. finally found stable housing around July 1 in a room in a condo, but K.K. had to lend him her credit card to pay for a credit check. Then he forgot to terminate the credit-check company contract, so K.K. ended up paying $90 for credit check charges before she took it upon herself to terminate the contract in December. D.N. did not have the money to pay the deposit for his new digs so he had to borrow the money for that, though not from K.K. And since he had been driving around with a suspended drivers' license since 2010, he had to borrow the money (though again, not from K.K.) to restore his license.

B. *General Financial Evidence After the August Breakup*

In addition to what we have already recounted about D.N.'s job efforts in the period May 20 through June 21, the court heard evidence concerning D.N.'s commitment to financial support in the period after August. K.K. testified her total medical bills during the pregnancy amounted to around $26,000, and she spent about $3,000 on clothes. On appeal D.N. makes no effort to show he paid for any significant portion of those amounts despite having had a job since June 21. K.K. testified he never paid for any maternity clothes or baby items. He *did* make phony entries in his check register to support a claim he sent her checks totaling $900. The ruse was uncovered when he refused to turn over his bank records prior to the trial, and those records had to be subpoenaed for the trial. Had such checks been given to K.K., he had insufficient funds in his account to cover them.

C. *Cyber-Stalking After the August Breakup*

We will not attempt to figure out (and neither did the trial court) how many times K.K. and D.N. broke up and reconciled in the period from the time they began dating in June 2012 through August 8, 2013. We can say with certainty that they broke up for the last time on August 8, 2013, at K.K.'s behest. D.N. professed shock at the news.

Though no longer an item with K.K., D.N. began (or maybe the better word would be "continued") cyber-spying on her.[2] There would be evidence at trial via an expert in cell phones that by knowing K.K.'s login and password for her iCloud phone, D.N. was able to track her whereabouts.

In the period after August 8, despite K.K. changing her passwords no less than five times, D.N. was able to know where she was much of the time. In October, for example, when she traveled with a male friend to San Diego, D.N. called the *friend*, and asked him to give the phone to K.K. so she could speak with him.

D.N. also used his access to K.K.'s phone to obtain the phone numbers of the first couple who expressed an interest in adopting the child. He made it clear to them he would oppose the adoption. An oppositional father was enough to cause them to lose interest.

A second couple, the B.'s, were located as potential adoptive parents in early October, 2013. D.N. used the contact information on K.K.'s phone to call them as well and to reiterate his opposition to any adoption. He would later send an email to them falsely claiming K.K. had used cocaine, marijuana and alcohol during her pregnancy. The B.'s, however, were not intimidated and continued their efforts through the trial.

The cyber-stalking "creeped out" K.K. Perhaps the worst of it occurred in mid-December (and we note here that K.K. was about eight months pregnant at this point) when she went to see an attorney and, while she was visiting that attorney, he got an email from D.N. asking the attorney about representing *him*. We note that D.N. already had an attorney at that time, so the trial judge was certainly not being unreasonable in discounting D.N.'s later protestation that he was just emailing every

---

[2] Even before the breakup D.N. had established a pattern of such spying. Back on May 14 (before the May 19 breakup), D.N. had figured out that K.K. bought someone else a drink, because he texted her about the purchase on the theory that one drink doesn't normally cost $23.

attorney in the county who did adoption work that particular day. A similar incident occurred about two weeks later, when K.K. went to a medical appointment that only her mother knew about. D.N. showed up in the parking lot.

The final instance of cyber-stalking occurred just prior to the birth. K.K. went to the hospital for an induced labor. The procedure had been kept secret but D.N. still showed up. He had to be escorted out.

D. *Evidence Favorable to D.N.*

At the trial, D.N. presented uncontradicted evidence he took a parenting class. He read multiple books on parenting. He purchased baby supplies and set up a nursery in the condominium where he lived. He obtained life and health insurance. He made arrangements for a pediatrician and a day care provider. D.N. also testified that while K.K. initially said he should give her money for the sake of her health, sometime later she indicated that because third parties would be paying her medical bills, it wasn't necessary for him to pay them.

## III. DISCUSSION

A. *Standard of Review*

An unwed father seeking *Kelsey S.* status has the burden of showing by a preponderance of the evidence that he qualifies. This rule is inherent in *Kelsey S.* itself. *Kelsey S.* is a constitutional law decision involving an as-applied challenge to a state statutory scheme. And it is garden variety constitutional law that a party challenging the constitutionality of a law as applied has the burden of "evincing facts" showing the application is unconstitutional. (*Associated Homebuilders v. City of Livermore* (1961) 56 Cal.2d 847, 854; accord, *Coffman Specialties, Inc. v. Department of Transporation* (2009) 176 Cal.App.4th 1135, 1145 ["On an as-applied challenge, the plaintiff must plead

and prove the specific facts giving rise to the alleged constitutional violation."].)[3] The burden was thus on D.N. to show enough facts to bring himself within *Kelsey S.* status, not on K.K. or the B.'s to show he did not qualify.

B. *Financial and Emotional Commitment*

*Kelsey S.* said our state paternity law is unconstitutional "*only to the extent it is applied to an unwed father who has sufficiently and timely demonstrated a full commitment to his parental responsibilities*." (*Kelsey S., supra*, 1 Cal.4th at pp. 849-850, italics added.) The court went on to encapsulate its narrow holding in this oft-quoted sentence: "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities – emotional, financial*, and otherwise* – his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id*. at p. 849, italics added.)

Because *Kelsey S.* was a case in which the trial court merely applied an existing statutory scheme which, by itself, barred any paternity claim by the unwed father, the case did not go into detail as to whether the plaintiff father there actually qualified under the full commitment test. What was meant by full financial and emotional commitment remained inchoate.

Full emotional commitment was a feature of the Supreme Court's next foray into the area of an unwed father's parental rights, *Michael H.* There, an unwed father did everything he possibly could to demonstrate the full commitment contemplated

---

[3] At least two other appellate opinions, *Adoption of H.R.* (2012) 205 Cal.App.4th 455, 466 (*H.R.*) and *Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679 (*O.M.*), also declare the burden is on the unwed biological father to show parental status under *Kelsey S.* but derive the rule a different way. *H.R.* simply cited *O.M.*, which in turn cited a dependency case, *In re T.R.* (2005) 132 Cal.App.4th 1202, 1210 *(T.R.)* and *T.R.* in turn cited *In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1653. *Spencer W.* was a case that centered on whether a man showed enough facts to fit within a pre-existing statutory presumption of fatherhood based on his taking a child into his home and holding the child out as his own (see Fam. Code, § 7611, subd. (d)). For this statutory burden-allocation rule, *Spencer W.* cited *Xebec Development Partners, Ltd. v. National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501, 545 (*Xebec*). *Xebec* was a liability insurance coverage case involving the question of whether a settlement between the insured and a third party established the insured's damages for purposes of its insurance claim. Regardless of the route taken, we are convinced this is the correct analytical destination.

All further undesignated statutory references are to the Family Code.

by the *Kelsey S.* court – *except* he did not promptly signal an intent to oppose an adoption in the months just after he learned of the pregnancy. (*Michael H., supra*, at p. 1060.) Rather, he went along with the mother's plan to adopt the child out, but changed his mind about five months later. While the trial and appellate courts thought he had done enough to qualify for *Kelsey S.* father status (*id*. at pp. 1049-1050), the Supreme Court reversed. The *Michael H*. court emphasized the father's indifference in the "short time" after he learned of the pregnancy. (*Id*. at p. 1060.)

In the case before us there is substantial evidence D.N. did not demonstrate a "full" commitment to either the financial or emotional elements of the *Kelsey S.* test. Financially, when K.K. and D.N. decided to have a child together by March 2013, D.N. was transient and unemployed, yet he took what the trial court could reasonably have considered a lackadaisical approach to job hunting until sometime in June, at which point he did buckle down and find a job and a fixed abode. (See *Adoption of A.S.* (2012) 212 Cal.App.4th 188, 212 [noting father had, among other things, a "'laissez faire attitude'" toward support of mother "emotionally or financially"].) D.N. showed himself financially irresponsible in his dealings with K.K. by borrowing money from her and never paying it back (despite getting a job at a car dealership in June), failing to close his credit check account and causing her to incur liability for it, and withdrawing the major part of the $200 he put in the baby fund. And the false entries in his checkbook for checks of $400 and $500 demonstrate not only that (1) he didn't make payments to support his child's mother in her pregnancy, but (2) he wanted to create a false impression of having made payments.[4] Children do not get fed and clothed on false checkbook entries, but courts may reasonably consider them in determining a putative parent's commitment.

---

[4]     We recognize the imaginative allusion to the musical *Chicago* in D.N.'s reply brief, but if there has been any "flim flam flummox[ing]" going on in this case, it is to be found in D.N.'s own checkbook entries.

9

As to the emotional element, we cannot ignore the negative effects of the cyber-stalking. There is no question it added to the stress of K.K.'s pregnancy. It seems the opposite of the emotional support required of would-be *Kelsey S.* fathers. (See *Arthur M., supra,* 149 Cal.App.4th at p. 721 (*Arthur M.*) [name calling by father was "distinctly *unsupportive* and emotionally degrading" and hence father did not measure up to "the *Kelsey S.* and *Michael. H.* standards"].) We further noted that D.N.'s fixation on knowing K.K.'s whereabouts often had no relationship with any well-being on the part of his unborn child, but centered on efforts to "'block adoption by others.'" (*Kelsey S., supra*, 1 Cal.4th at p. 849, quoting *In re Racquel Marie X.* (1990) 76 N.Y.2d 387, 408.) All in all, we think the record replete with support for the trial court's judgment.

C. *The "Catch-22" Problem in Kelsey S. Jurisprudence*

In her dissent in *Michael H.*, Justice Kennard identified an inherent practical problem facing all would-be *Kelsey S.* fathers: What if the efforts of the unwed father to demonstrate his full commitment to parenthood *themselves* cause emotional distress to the pregnant unwed mother?[5] The problem was later dubbed a Catch-22 by the court in *Adoption of Baby Boy W.* (2014) 232 Cal.App.4th 438, 460 (*Baby Boy W.*), and used by that court to excuse the would-be father's "social media campaign." The father's campaign involved taking his disagreement with the mother's preference for adoption to two public websites, Facebook and Change.Org.[6] The *Baby Boy W.* court said the campaign was "ill-conceived and poorly executed," but nevertheless did not

---

[5] "The majority's decision creates a dilemma for a biological father: if in the early stages of the mother's pregnancy he vigorously opposes the mother's decision to relinquish their child for adoption, he runs the risk of irreparably damaging his relationship with the mother and causing her emotional upset, *quite the opposite of the emotional support he must give under Kelsey S.*, *supra*, 1 Cal.4th 816. If, on the other hand, he initially acquiesces in the mother's decision to place the child for adoption, hoping to change her mind before the child is born, he has, under the majority's holding, forfeited his right to object later in the pregnancy to the child's adoption." (*Michael H., supra*, 10 Cal.4th at pp. 1068-1069 (dis. opn. of Kennard, J.).)

[6] The campaign itself began after the trial court stayed the father's proceedings. The father then initiated an online petition campaign urging a change in California law on the Change.Org site and created a related Facebook page "Help me Keep my Child From Being put up for Adoption," which itself, said the appellate court opened a "Pandora's Box of hurtful commentary from uninvolved third parties." (See *Baby Boy W., supra*, 232 Cal.App.4th at p. 461 and pp. 448-449.)

*disqualify* the father from *Kelsey S*. status. (*Id*. at p. 461.) Thus in affirming a finding that an unwed father *did* qualify under *Kelsey S.*, the *Baby Boy W.* court said the social media campaign was *only* in response to the unwed mother's attempt to terminate his rights, and only then in the context of their becoming litigation adversaries. Thus, it could not be counted against him in regard to the requirement he show emotional support for the unwed mother.

But unwed fathers have options even in the face of the Catch-22 arising out of an unwed mother's opposition to the father's assertion of parental rights. If, as in the case before us, it appears the unwed mother refuses, after a certain point, to take money from the unwed father, the father can still open a dedicated bank account and make regular deposits into it in order to demonstrate he is putting money away for the day when, given the logic of his legal position, he must be prepared to assume all financial responsibility for the child. (See *Kelsey S., supra*, 1 Cal.4th at p. 849 [stressing father must be willing to assume "'full custody of the child'"].) If an unwed father's assertion of full commitment to the responsibilities of parenthood means anything, it means he must be prepared to support the child in his own home with his own resources (see *Helgestad v. Vargas* (2014) 231 Cal.App.4th 719, 735) or, if for some reason the child were one day to live outside his home, by paying child support. As our Legislature declared in section 4053, subdivision (a): "A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life." A bank account can, after all, be established unilaterally without interfering with the unwed mother's pregnancy and shows tangible proof that the prospective *Kelsey S.* father really has put his money where his mouth is. In this case, however, D.N. did not open any account on his own in order to make regular deposits into it. In fact, he withdrew 80 percent of the meager joint account that was opened. Obviously the couple had discussed the idea of a dedicated *joint* account, but D.N. must have rejected the idea with regard to his own money.

11

Likewise, even if the prospective *Kelsey S.* father is not allowed contact with the mother, he can show emotional support by doing no harm. If the mother does not want any contact, so be it. But the father need not create *gratuitous* emotional distress by calling the mother bad names (as in *Arthur M.*), or, as in the case before us, indulging in a form of stalking. We would add here that D.N.'s cyber-stalking of K.K. in this case is different from the social media campaign the trial court excused in *Baby Boy W.* That campaign was launched *after* the litigation began. Here D.N. cyber-stalked K.K. throughout her pregnancy. And we note the social media campaign in *Baby Boy W.* was intermediated by public websites such as Facebook and Change.org. D.N.'s campaign here was based on computer hacking stealthily directed at K.K.'s whereabouts. It was directed spang at her, giving her the sense there was nowhere she could hide. This is not just a failure of emotional support, this is the opposite of it.

D. *The H.R. Case*

What we have already said is sufficient to establish there was no error here on the trial court's part in finding the D.N. did not qualify for *Kelsey S.* fatherhood. D.N. did not demonstrate a *full* commitment on either the financial or emotional – and we use this word deliberately – *elements* of *Kelsey S.* parenthood. These are requirements. As we read *Kelsey S.* and *Michael H.*, the prospective father must satisfy *all* the major aspects of parenthood, *including but not limited to*, a full financial *and* emotional commitment. The Supreme Court did not say "*or* otherwise."

We are aware, however, of one appellate decision that does not fit this paradigm, *H.R., supra*, 205 Cal.App.4th 455, decided in 2012. *H.R.* is an outlier because in that decision it was pretty obvious the would-be *Kelsey S.* father fell down on both the financial and emotional elements of a full commitment to parenthood – and fell down heavily on the emotional element, to the point of actual physical abuse. Yet the appellate court still upheld a finding the father qualified under *Kelsey S.* Not surprisingly, D.N. relies heavily on *H.R.* to argue that under the evidence here he is entitled, as a matter of

12

law, to *Kelsey S.* father status based on such positive factors as his having obtained insurance, read up on parenting, and bought baby supplies. We are not convinced.

Here's what happened in *H.R.*: In the early stages of the mother's pregnancy, the biological parents had a "rocky" relationship that included verbal and physical abuse by the unwed father, as well as constant fights. (*H.R., supra*, 205 Cal.App.4th at p. 458.) On top of that, the trial court also found that the father had not fully supported the mother financially, at least as "completely" as he might have done. (*Id*. at p. 470.) But despite the fights, verbal and physical abuse, and less-than-full financial support, the trial court found that the unwed father was indeed a *Kelsey S.* father, citing other aspects of his behavior: He had participated in prenatal care, attempted to marry the mother, lived with her a short time, and promptly sought a determination of his paternity and DNA testing. (*Id*. at pp. 463-464.) But despite the finding the father qualified under *Kelsey S.*, the trial court terminated the father's parental rights because he was unfit. (*Id*. at p. 462.) Thus despite having been given *Kelsey S.* status, father had to appeal.

The appellate court found father qualified for *Kelsey S.* fatherhood and reversed termination of his parenthood. The published part of the opinion does not actually address the reason for reversal of the termination. The legal discussion portion of *H.R.* consisted of parts I through IV, but the panel only published parts I and II, leaving parts III and IV unpublished. Part I was a general discussion of *Kelsey S.* law, leading up to the conclusion that *if* an unwed father qualifies under *Kelsey S.*, then the father must be shown to be statutorily unfit to have his parental rights terminated. (*H.R., supra*, 205 Cal.App.4th at p. 466, citing *Kelsey S., supra*, 1 Cal.4th at pp. 850-851.) Part II was devoted entirely to refuting the prospective adoptive mother's argument that the father did not qualify under *Kelsey S.* (See *H.R., supra*, 205 Cal.App.4th at pp. 466-470.) The part of the opinion reversing the judgment on the basis that the finding of unfitness

13

was unsupported necessarily must have been in one of the unpublished parts III or IV of the opinion.

It is part II of the *H.R.* opinion that D.N. relies on here. The core of that part is a rejection of the idea that the father's failure to fully support the mother either emotionally or financially disqualified him from *Kelsey S.* status. Rather, the *H.R.* court treated both the financial and emotional elements of *Kelsey S.* as but a single negative factor[7] to be weighed against the father, and balanced that single negative factor against a number of positive factors – such as participating in prenatal care and taking legal action – that militated in the father's favor. In the process, the opinion euphemized the father's verbal and physical abuse as merely a "less than ideal relationship."[8]

While we respect the *H.R.* court's approach, we take a somewhat dimmer view of verbal and physical abuse.[9] Rather than turning the logical somersaults

---

[7] "L.R. [the prospective adoptive mother] relies on the court's finding that father did not financially or emotionally support mother during her pregnancy, and we agree that this is *a factor* we consider, but the cases cited by her briefing are distinguishable. In *In re Elijah V.* (2005) 127 Cal.App.4th 576 (*Elijah V.*) a biological father who, at most, sent $300 and diapers for a year was found not to be a *Kelsey S.* father. In *Elijah V.*, however, the father did not publically acknowledge his paternity, telling only his mother. When his paternity was questioned, he lost interest. He never tried to parent the child and never claimed he was willing to take full custody. Instead, he said he was in 'no position' to take the child and placing the child with him would be 'abuse.' (*Elijah V., supra*, 127 Cal.App.4th at p. 583.)" (*H.R., supra*, 205 Cal.App.4th at p. 470, italics added.)

[8] "In the instant case, the record is clear that father had limited financial resources and large financial commitments – child support obligations, restitution and fines, and legal expenses. He testified he could not obtain insurance for minor until she was in his house. He failed, however, to show he paid 'pregnancy and birth expenses commensurate with his ability to do.' (*Kelsey S., supra*, 1 Cal.4th at p. 849.) During some portion of the relevant time period, he had a job and *he did not establish to the trial court's satisfaction either that he helped to support mother and minor or that he was completely unable to do so*. Nonetheless, L.R. cites no case – and we have found none – that denied a father, who promptly acknowledged paternity, accompanied mother to prenatal care, visited his child, was willing and able to immediately take custody of his child, and took extensive legal action to secure his parental rights and custody of his child, *Kelsey S.* status solely on the basis of his failure to provide financial assistance to the mother and his *less than ideal relationship* with her." (*H.R., supra*, 205 Cal.App.4th at p. 470, italics added.)

[9] For our purposes, we do not need to also disagree with the *H.R.* court's forgiveness of the father's less-than-full financial commitment. That was a much closer call, because the father's finances were already strained by child support payments for two children of a previous marriage, the need to pay down a large ($18,000) child support arrearage and a group of fines, restitution orders and legal expenses. (*H.R., supra*, 205 Cal.App.4th at pp. 460, 470.) Perhaps, given such impecunious circumstances, the father really was doing all he could on the financial end. A "full" financial commitment does not mean the last farthing. But there is no way we can agree with the *H.R.* court's excusing verbal and physical abuse of the mother.

14

necessary to distinguish *H.R.* from our case,[10] we choose to disagree with it.  The opinion seems to us inconsistent with the text of *Kelsey S.*, which requires a full commitment on the financial, emotional "*and* otherwise" aspects of parenthood.  We cannot find in *Kelsey S.* any balancing test that would excuse financial or emotional deficiencies by looking to other considerations.[11]

H.R. is also inconsistent with Supreme Court's actual holding in *Michael H., supra*, 10 Cal.4th 1043.  There the unwed father was far better behaved toward the unwed mother than the father in *H.R.*  Indeed, comparing the facts in *Michael H.* with those in *H.R.*, it seems to us that in *Michael H.* there was a far stronger case for *Kelsey S.* fatherhood than in *H.R.*, but the father lost in that case.  The *H.R.* court did not mention *Michael H.* at all, much less attempt to distinguish it.[12]

---

[10]    Two published opinions have distinguished *H.R.* so far.  *Adoption of A.S., supra*, 212 Cal.App.4th 188 distinguished *H.R.* on the theory that in *A.S.* there were a variety of factors showing a lack of commitment to parenthood, namely lack of financial support, lack of contact during pregnancy, "'a complete absence'" of communication to the unwed mother of the father's willingness to support her emotionally or financially and a "'laissez faire attitude'" about "truly wanting to raise his child." (*Id*. at p. 213.)  More recently, in *Adoption of Emilio G.* (2015) 235 Cal.App.4th 1133, 1148, the court distinguished *H.R.* on the ground that the father's "attendance at prenatal visits was perfunctory at best, his actions toward [the mother] were harmful, and he did not diligently pursue his parental rights."  On the next page the *Emilio G.* court distinguished *H.R.* on the theory the father "physically and emotionally abused [the mother], who did obtain a restraining order." (*Id.* at p. 1149.)  We would point out, though, that in *H.R.* the father's actions were, as in *Emilio G.*, likewise harmful and also involved physical and emotional abuse.

[11]    *Baby Boy W.*, *supra*, 232 Cal.App.4th 438 should not be read as countenancing a balancing-of-factors approach to *Kelsey S.* fatherhood.  The *Baby Boy W.* court affirmed a trial court's determination an unwed father qualified under *Kelsey S.* by painstakingly demonstrating that there was substantial evidence the father had successfully run a gauntlet of seven "factors," including financial and emotional commitment. (See *id*. at pp. 454-461.)  Significantly, the appellate court noted that his financial support was consistent with the father's own "limited financial resources." (*Id*. at p. 457.)  Where the father had most fallen down, as we have noted above, was an ill-advised social media campaign to stop the adoption, but that certainly wasn't at odds with a commitment to fatherhood. (See *id.* at p. 461.)  The *most* that can be wrung from *Baby Boy W.* is the appellate court's quotation, without disapproval, of a statement made by the trial judge that financial contribution during pregnancy is "'not a dispositive issue in any event.'" (*Id*. at p. 456.)  We have looked, and we don't find any "not a dispositive issue" language in *Kelsey S.* itself.  Moreover, the main point of the "not a dispositive issue" passage in *Baby Boy W.* was not to excuse skipping out on paying pregnancy and birth-related expenses (*id*. at pp. 456-457) or excuse a less-than-full financial commitment on the part of an unwed father, but to say the funds don't necessarily have to come from the father's own employment, as distinct from other sources like, as in *Baby Boy W.*, the father's own parents. (*Id.* at p. 457.)  And to the degree that *Baby Boy W.* excused the father from paying for pregnancy and birth-related expenses because the mother did not "require" them (see *ibid*.), the fact remains that there was evidence the father did all he could, consistent with his limited means.

[12]    In the *H.R.* court's defense, one senses, in studying the opinion, that the court did not receive the benefit of first drawer briefing from the parties.  For example, it appears the prospective adoptive mother relied only on two easily distinguishable cases, *In re Charlotte D.* (2009) 45 Cal.4th 1140 (*Charlotte D.*) and *Elijah V., supra*,

15

Finally, the *H.R.* opinion is inconsistent with this court's decision in *Arthur M.*, which made a point of saying that name calling by the father was "distinctly *unsupportive* and emotionally degrading." (*Arthur M., supra*, 149 Cal.App.4th at p. 721.) None of those decisions used a balancing of factors approach to excuse what *Kelsey S.* clearly said was a *minimum* requirement to show the unconstitutionality of our state's paternity statutes as applied to a given unwed father.

In fine, we think the balancing of factors begins only *after* it is determined the father fully committed to emotional and financial support. We think the trial court got it right, and we find nothing in the law to support a reversal.

## IV.  DISPOSITION

The order is affirmed.

BEDSWORTH, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

IKOLA, J.

---

127 Cal.App.4th 576 (*Elijah V.*). *Charlotte D.* was a case where an unwed father was allowed to receive the child into his home, but expressly waived his parental rights when a guardianship was established. Moreover, his conduct *toward the child* when they were living at home was bad, described by our high court as behaving "inappropriately and even cruelly" to the child. (*Id*. at p. 1149.) *Elijah V.* was a case where the unwed father's omissions were numerous: He only told one person he was the child's father, he never publicly acknowledged the child as his own, he became uninterested when his paternity was questioned, he never was willing to take full custody and he even said placing the child with him would constitute "'abuse.'" (*Id*. at p. 583.) The *H.R.* court could not base an opinion on those two cases, and may not have been given others. (See *H.R., supra*, 205 Cal.App.4th at pp. 469-470)

Obviously, distinguishing *Charlotte D.* and *Elijah V.* did not establish, by itself, that the father in *H.R.* met the requirements of *Kelsey S.* It only showed that, at most, the unwed father in *H.R.* wasn't *as unqualified* as the fathers in *Charlotte D.* and *Elijah V.* The tough task would have been to show that the father in *H.R.* was more qualified than the father in *Michael H.*, but the *H.R.* court didn't attempt that.

It is also possible the *H.R.* court simply didn't think the *Michael H.* decision was applicable at all because in *Michael H.* the father's main area of dereliction centered on his early *acquiescence* to adoption rather than actual verbal and physical abuse. That said, we cannot see how initial acquiescence to adoption can be said to be disqualifying when verbal and physical abuse isn't.

16