Filed 11/24/21  Adoption of T.W. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| Adoption of T.W., a Minor. | C094016 |
| T.W. et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>N.M.,<br><br>Defendant and Appellant. | (Super. Ct. No. STAFLADOP20190006452) |

N.M., biological father (father) of the infant minor T.G.W. (minor), appeals from an order terminating his parental rights and freeing the minor for adoption by prospective adoptive parents T.W. (adoptive father) and M.W. (adoptive mother).  N.M. contends the trial court erred by finding he did not establish the prerequisites to withhold consent to the adoption under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).  We affirm the juvenile court's order.

### FACTS AND HISTORY OF THE PROCEEDINGS

N.M. and M.H. (mother), the unwed biological parents of the minor, separated during early in mother's pregnancy in December 2019, about eight months before the

minor was born. Mother went to a domestic violence shelter when she fought with N.M. in December 2019, returned, then went back to the shelter. N.M. never saw mother personally after she left; he attempted to reach her on Facebook Messenger a number of times and had two conversations with her but was otherwise unsuccessful.

According to N.M., in March 2019, he asked mother if she needed anything or any help, and she responded that she was "gonna have an abortion," asked him to leave her alone and not contact her, and that she did not need help. This was the last time N.M. contacted mother. Mother proceeded with adoption planning and completed initial adoption paperwork identifying N.M. as the biological father and said that he "was not involved at that point" and she "had left because of a domestic violence situation, and that he had requested that she have an abortion." Jennifer Shimabukuro, the adoption facilitator, attempted to contact N.M. at the phone number provided by mother and left a voice message for him; he did not respond. Mother later declared that N.M. did not provide money for her child support expenses or any help with the pregnancy expenses. Mother also declared that she discussed adoption with father, but she did not know whether he would agree. According to Shimabukuro, mother indicated that N.M. requested that she terminate the pregnancy. On the date of the minor's birth (in August 2019), M.H. gave the minor up to the adoptive parents, whom M.H. had met through an adoption agency. The adoptive parents filed their adoption request.

On December 13, 2019, the State Department of Social Services (DSS) sent a letter to N.M. "informing him of the adoption plan and possible steps he could take to agree or object to the plan." DSS investigator Kim Arikawa testified that she did not remember the mailing address off the top of her head, but believed "it's something like 1646 46th Avenue, or something like that, in Oakland." DSS stated that the letter was not returned by the post office as undeliverable and also that N.M. did not respond to the letter. N.M. testified that he did not receive the letter from DSS because he had moved by that point and did not provide a change of address form to the post office.

2

Attorney James Handy declared that he tried to have N.M. personally served with a notice to the alleged father regarding the adoption and requirement that he seek to establish his paternity. Handy also conducted searches through three private internet search companies for N.M., which yielded the same Oakland address. On February 10, 2020, Handy contacted the phone numbers produced by the searches and was able to speak with N.M. According to Handy, he told N.M. that mother had named him as a possible father and she had placed the baby for adoption, and N.M. then "called [mother] a few names and denied paternity." N.M. requested that the form for denying paternity be e-mailed to him and refused to provide his address. N.M. denied telling Handy that he denied paternity.

After the call, Handy e-mailed N.M. the one-page form to deny paternity to the e-mail address he provided, which N.M. concedes he received. Handy attempted to reach N.M. by phone and e-mail several additional times in February through April 2020. N.M. claimed that he called Shimabukuro and she denied knowledge of the adoption, but Shimabukuro denied ever speaking with N.M.

On April 22, 2020, N.M. sent an e-mail to Handy asking if the minor was biologically his child. Handy responded with information about paternity testing. N.M. provided his address and stated that he wanted to pursue the testing. On May 19, 2020, N.M. e-mailed Handy that he had not received any of the documents despite providing his address. On May 22, 2020, Handy e-mailed N.M. that his process server had attempted four times to serve the documents on N.M. without success and requested N.M.'s assistance.

On May 29, 2020, N.M. filed an action to seek custody or to establish a parental relationship. On July 23, 2020, the adoptive parents filed a petition pursuant to Family Code section 7662 (statutory section citations that follow are to the Family Code unless otherwise stated) to terminate parental rights of the alleged father, N.M. The court appointed counsel for N.M. and ordered paternity testing. The DNA testing results

3

ultimately confirmed his parentage on October 22, 2020.  N.M. did not file a motion for visitation or contact pending trial.  The court set a trial on the section 7662 petition for January 14, 2021.

On January 14 and January 15, 2021, the trial was held.  The court concluded in its ruling after trial on February 24, 2021, that N.M. did not show by a preponderance of the evidence that he promptly came forward and demonstrated full commitment to his parental responsibilities.  The court found that "[t]here is no dispute that [N.M.] does not have statutory presumed father status" and analyzed whether he qualified as a *Kelsey S.* father.  The court found "no evidence that before or after [mother] left, [N.M.] provided any assistance to [mother] with respect to the pregnancy."  The court noted that N.M. "did not testify that he tried to convince [mother] to not get an abortion or offer to parent the child after birth."  Nor did N.M. tell mother that he was against adoption.  While the court acknowledged that after Hardy contacted N.M., he did "take steps to demonstrate a commitment to his paternal responsibilities," these steps did not "counterbalance the steps that were not taken when [N.M.] knew that [mother] was pregnant."

Additionally, the court noted that mother told Shimabukuro that she left N.M. "because of domestic violence and that he wanted her to have an abortion."  Accordingly, the court concluded that N.M.'s "actions did not demonstrate that he was supportive of [mother's] physical and emotional health while carrying the child in that twice she left and sought assistance at a shelter."  The court ordered parental rights be terminated and also found that the termination was in the best interests of the minor because removal of custody from the adoptive parents would be detrimental to her health and welfare.

N.M. timely appealed.

## DISCUSSION

N.M. challenges only the trial court's findings with respect to his constitutional rights under *Kelsey S., supra*, 1 Cal.4th 816 and *Adoption of Michael H.* (1995)

4

10 Cal.4th 1043 (*Michael H.*).  N.M. contends the juvenile court erred when it found he did not rise to the status of a *Kelsey S.* father because "[t]he undisputed facts demonstrate [N.M.] did everything reasonably possible to establish a parental relationship with the child, especially in light of [] mother's statement to him she needed nothing because she was having an abortion and the obfuscation of the truth by the [adoption] agency and attorney Handy."  His claims lack merit.

"An unwed father's rights and duties under the Uniform Parentage Act of 1973 (UPA), adopted by our Legislature as Family Code section 7600 et seq., substantially depend on whether he is a 'presumed father' within the meaning of Family Code section 7611." (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1228.)  "Whether a biological father is a 'presumed father' . . . is critical to his parental rights." (*Kelsey S., supra*, 1 Cal.4th at p. 823.)  Only " 'presumed fathers' " are entitled to custody and reunification services. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449.)

"In order to become a 'presumed' father, a man must fall within one of several categories enumerated in Family Code section 7611." (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 595.)  One of the ways a man can establish presumed father status is if he meets the conditions provided in section 7570. (§ 7611.)  Section 7570 and the sections that follow it address the establishment of paternity by voluntary declaration. "[A] voluntary declaration of paternity that is in compliance with all the requirements of section 7570 et seq. . . . entitles the father to presumed father status in dependency proceedings." (*In re Liam L.* (2000) 84 Cal.App.4th 739, 747; see *In re Raphael P.* (2002) 97 Cal.App.4th 716, 722-723.)  Unless rescinded or set aside, a voluntary declaration of paternity has the same force and effect as a judgment of paternity issued by a court of competent jurisdiction. (Former § 7573, subd. (a); *Kevin Q. v. Lauren W.* (2009) 175 Cal.App.4th 1119, 1132.)  A voluntary declaration of paternity can, however, be set aside if the declarant is found not to be the child's father, or due to mistake,

5

inadvertence, excusable neglect, or fraud.  (*In re William K.* (2008) 161 Cal.App.4th 1, 9-10.)

It is undisputed that father is the biological father of the minor.  It is also undisputed that he was not present at the minor's birth and did not sign a voluntary declaration of paternity.  Where, as here, a biological father does not fulfill the statutory criteria to qualify as a presumed father, he may nevertheless attain parental rights equal to those of the mother by showing he promptly stepped forward to assume full parental responsibilities for the child's well-being, including a financial, emotional or other commitment; the child's mother or a third party prevented him from assuming his parental responsibilities or physically receiving the child into his home; and he demonstrated a willingness to assume full custody of the child.  (*In re Jason J.* (2009) 175 Cal.App.4th 922, 932; *In re D.M.* (2012) 210 Cal.App.4th 541, 545.)  Such an individual is often referred to as a *Kelsey S.* father.  (*Kelsey S., supra*, 1 Cal.4th at p. 849.)  "From the precise language used by the court in *Kelsey S.* and as demonstrated by the holding in the later Supreme Court case of [*Michael H.*], there are at least two elements of 'full commitment':  (1) a demonstration of a willingness to financially support the child and (2) a willingness—at least to the extent she makes possible—to emotionally support the unwed mother during her pregnancy."  (*Adoption of T.K.* (2015) 240 Cal.App.4th 1392, 1394.)  Stating opposition to adoption by seeking to block the adoption by others is insufficient.  (*Kelsey S.,* at p. 849.)  "This is so because 'the mere existence of a biological link does not merit . . . constitutional protection' [citation]; rather, the federal Constitution protects only the parental *relationship* that the unwed father has actively developed by ' "com[ing] forward to participate in the rearing of his child" ' [citation] and 'act[ing] as a father' [citation]."  (*Michael H., supra*, 10 Cal.4th at p. 1052.)

In reviewing a determination whether a parent meets the requirements of *Kelsey S.*, we review the factual findings for substantial evidence and "[t]o the extent that

6

the issue is a mixed question of law and fact, we exercise our independent judgment in measuring the facts against the applicable legal standard." (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.) We examine the whole record to determine whether substantial evidence supports the judgment, drawing all reasonable inferences and resolving all evidentiary conflicts in favor of the trial court's findings, and we do not reweigh the evidence. (*In re A.A.* (2003) 114 Cal.App.4th 771, 782; *In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1650.) Under the substantial evidence standard, an appellant may not win reversal simply by citing the evidence favorable to the appellant. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

N.M.'s challenge fails because he does not show that he met the *Kelsey S.* standard on the full facts found by the trial court. Instead, he asks us either to reject the court's credibility findings against him and make new findings in his favor, or to cherry-pick the record for allegedly uncontroverted facts favorable to him while ignoring the rest. N.M.'s argument fails in "his portrayal of the facts as he would like them seen rather than as the trial court found them." (*Adoption of A.S.* (2012) 212 Cal.App.4th 188, 214.) We decline either to set aside the court's credibility findings or to consider the facts N.M. cites (even assuming them to be uncontroverted, which respondents do not concede) in isolation from the record as a whole.

Here, we conclude substantial evidence in the record supports the court's determination that father did not qualify as a *Kelsey S.* father. Father testified that he knew mother was newly pregnant at the time their relationship ended. Yet he presents no evidence that he demonstrated a willingness to financially support the child or at least emotionally support mother during the pregnancy. He also testified that in March 2019, about four months into the pregnancy, he contacted mother and asked if she needed any help, and she responded that she was going to have an abortion and asked him not to contact her. Thus, according to N.M.'s own testimony, he knew that mother was past the first trimester and had not terminated her pregnancy at that time, yet he took no further

steps to offer support or confirm that she did indeed decide to terminate the pregnancy. Further, as the juvenile court acknowledged, N.M.'s actions after birth arguably were somewhat more diligent than his actions before birth, the Supreme Court has held that a parent cannot compensate for his lack of demonstration of a " 'full commitment' to parenthood during pregnancy . . . by attempting to assume his parental responsibilities many months *after* learning of the pregnancy." (*Michael H., supra*, 10 Cal.4th at pp. 1054-1055.)

N.M. contends the juvenile court failed to assess his conduct in light of evidence of the conduct of mother and other third parties. For example, he argues he cannot be faulted for failing to pay mother's pregnancy and birth-related expenses because he presumed that mother had an abortion. However, the evidence shows father waited until about four months into the pregnancy to contact mother, did not offer any support or offer to raise the child, and did not attempt to obtain information about whether she actually terminated the pregnancy. The fact that she had not yet terminated the pregnancy by this time though the pregnancy was known to both mother and N.M. for several months should have given N.M. some indication that she may have been hesitant to terminate the pregnancy and to follow up with mother or a mutual contact or seek the advice of legal counsel. There is no evidence in the record that N.M. would have been willing to pay for and participate in prenatal and delivery costs or care for the child. While N.M. asserts he "was not required to relentlessly hound her in an attempt to convince her not to have an abortion in order to retain his parental rights," he cites no authority to support his position or delineate what amount of effort is sufficient. By his own admission, N.M. was able to reach mother but only spoke to her about the pregnancy once after she moved out. There is no evidence that N.M. opposed mother aborting the child or giving the child up for adoption during that conversation or at any other time. The record thus supports the court's finding that he "did not try to convince [mother] to not have an abortion, he did

not offer to parent the child, or offer specific financial or emotional support both pre-birth or post-birth in stating he wished to help raise the child."

As the juvenile court found, N.M. did not consistently come forward to assume his full parental responsibilities during mother's pregnancy, which is required under *Kelsey S.* (*Michael H., supra*, 10 Cal.4th at pp. 1054-1055; *Kelsey S., supra*, 1 Cal.4th at p. 849.) He presented no testimony or evidence that during the pregnancy that he stated or demonstrated to mother that he wanted to be a parent, or that he would raise the child or help raise the child with her should she carry the baby to term. Rather, during that time he consistently sought to avoid those responsibilities: Mother told Shimabukuro that N.M. requested that she terminate the pregnancy; mother later declared that N.M. did not provide money for her child support expenses or any help with the pregnancy expenses; and mother also declared that she discussed adoption with father, but she did not know whether he would agree. In light of this evidence, N.M.'s belated efforts to assert paternal status after the minor's birth do not meet his burden to establish his entitlement to withhold consent to the adoption. (*Michael H.,* at p. 1054; *Kelsey S.,* at p. 849.)

While N.M. focuses on the fact the juvenile court noted the purported history of domestic violence, as we have discussed, the focus of the court's ruling was on N.M.'s failure to promptly come forward and demonstrate a commitment to his parental responsibilities during the course of the pregnancy. N.M. contends there was not substantial evidence he had actually perpetrated domestic violence or that this disqualified him as a *Kelsey S.* father. Because this was a concise factual finding and not the focus of the court's analysis, we reject his claim.

Finally, we conclude the juvenile court did not err in finding termination of parental rights in minor's best interest. (See § 7664.) The minor had been living in the home of the adoptive parents for approximately one and a half years at the time of the ruling and was doing well. N.M. had no relationship with mother. As discussed at length above, independent of mother's evasiveness regarding her pregnancy, father failed to act

9

diligently and, as a result, had no relationship with the minor. And as the court noted, the removal of the minor from the adoptive parents' care would result in "tremendous emotional stress" and would be detrimental to her health and welfare because "numerous witnesses testified to the bond already formed between [the minor] and the [adoptive parents]." Thus, there was significant evidence in the record to support the conclusion that termination of parental rights was in the minor's best interest. N.M. does not raise a persuasive argument that the best interests determination was in error. The court did not abuse its discretion in terminating parental rights under section 7664.

There was sufficient evidence to support the juvenile court's finding that father did not meet the criteria set forth in *Kelsey S.* and to support the termination of parental rights.

DISPOSITION

The juvenile court's orders are affirmed.

 

 

 

 

                                 _____

                                 HULL, J.

 

 

 

We concur:

 

 

_____

BLEASE, Acting P. J.

 

 

_____

RENNER, J.