Filed 1/25/22  In re G.D. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re G.D., a Person Coming Under the Juvenile Court Law. | C093850 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | (Super. Ct. No. STK-JV-DP-2019-0000225) |
| Plaintiff and Respondent, | |
| v. | |
| J.E. et al., | |
| Defendants and Appellants. | |

J.E., the biological father (father), and N.A., the biological mother (mother), of the infant minor G.D. (minor), appeal from orders terminating their parental rights and freeing the minor for adoption.  Specifically, father and mother assert that the trial court erred in failing to conduct a mandatory paternity inquiry as provided by Welfare and Institutions Code section 316.2.[1]  We disagree and shall affirm.

---

[1]   Undesignated statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

Test results from two of mother's prenatal appointments returned positive for amphetamine and marijuana. On April 6, 2019, the San Joaquin County Human Services Agency (Agency) was informed that mother tested negative for substances when she gave birth to the minor, but they were unable to test the minor's urine sample because it was contaminated.

The Agency social worker interviewed mother regarding concerns about the minor's exposure to drugs in utero. Mother identified S.D., who was present during the interview, as the minor's father and part of her support system. Mother reported that she had an "on and off" relationship with the minor's purported father, S.D. The reporting party stated that S.D. did visit mother and the minor in the hospital. For his part, S.D. told the social worker that he signed the declaration of paternity. He denied knowledge of mother's drug use because they "were broken up during the pregnancy for a little bit," but noted that mother was currently sober.

On April 18, 2019, mother advised the social worker that an incident of domestic violence had occurred between her and S.D. The social worker then obtained a protective custody order due to mother's lack of follow through with the safety plan. At the subsequent detention hearing, S.D. again affirmed that he was the minor's father. The juvenile court found that S.D. was an alleged father because he claimed he signed the declaration of paternity but could not provide a copy. At the jurisdictional hearing, the Agency informed the court that a copy of the minor's birth certificate was obtained but did not list anyone as the minor's father. The court ordered DNA testing for S.D.

At a subsequent jurisdictional hearing, mother submitted on jurisdiction and the court found the allegations of the petition true and ordered mother to be assessed by the drug court. The Agency informed the court that S.D. did not appear for paternity testing and was referred again for testing. The Agency's September 11, 2019 disposition report showed several referrals for paternity testing were made for S.D. but remained pending

2

because S.D. was incarcerated with a release date of September 2, 2019. Mother and S.D. did not appear at the September 17, 2019 dispositional hearing, at which the parties submitted on disposition. The Agency advised the court that the paternity results excluded S.D. as the biological father of the minor, and he was dismissed from the dependency proceeding.

At the December 3, 2019 hearing on paternity issues, the Agency informed the court that mother named L.B. as the father of the minor. L.B. stated he believed he was the biological father, so the court ordered DNA testing for him. DNA testing excluded L.B. as the minor's biological father and he also was dismissed from the dependency case on January 21, 2020. During this hearing, with all parties present, the court inquired, "And do we have any other candidates as possible father?" The Agency responded, "Not that the mother has told us at this time."

On February 28, 2020, S.D.'s sister and her husband, who had been caring for the minor during the proceedings, filed a request to be appointed as the minor's de facto parents. The Agency's March 5, 2020 status review report reflected that mother gave father J.E.'s name as another alleged father of the minor in March 2020 but did not provide any identifying or contact information to assist the Agency in locating him. The minor was stable in placement and shared a strong bond with her caregivers, who were willing to adopt the minor if mother failed to reunify.

Mother was not present at the March 10, 2020 hearing and the court ordered her reunification services terminated and granted de facto parent status to the minor's caregivers. On May 11, 2020, the Agency filed a declaration naming father as the alleged father of the minor, stating that reasonable diligence was exercised in attempts to locate father, as demonstrated in the absent parent locator report dated March 26, 2020, and requesting that service to father and any unknown father of the minor be made by publication in the newspaper. An order for publication was signed by the court on

3

May 11, 2020. On June 8, 2020, the notice to father and any unknown father of the minor was posted in the local newspaper.

The Agency's June 9, 2020 section 366.26 report reflected that mother still was not able to provide any information to assist the Agency in locating father. The Agency recommended terminating parental rights with a permanent plan of adoption for the minor. At the July 8, 2020 section 366.26 hearing, the Agency informed the court that father had made contact the previous day and indicated that mother recently informed him that the minor might be his child. The court continued the matter for six weeks and ordered paternity testing. Subsequently, at an October 16, 2020 appointment of counsel hearing, father appeared for the first time in the dependency proceedings and the court found he was the biological father of the minor based on the paternity testing results, appointed counsel, and authorized supervised visits between father and the minor.

At the October 21, 2020 contested section 366.26 hearing, minor's counsel objected to visitation because the proceedings were at the section 366.26 hearing stage, the minor was 18 months old, and she had never met father. The court vacated the visitation order and continued the hearing.

On October 27, 2020, the Agency filed a section 342 subsequent petition alleging that new facts or circumstances unknown at the time of the initial petition existed, including the discovery that father was the biological father of the minor, his ability to care for her was unknown, he was not a legal resident of the United States, and the Agency was unable to complete a background check due to his immigration status. At the October 28, 2020 jurisdictional hearing, the court ordered no visitation for father and continued the matter. The Agency's December 11, 2020 report showed that mother engaged in a brief relationship with father. Father indicated that he knew mother was pregnant but was uncertain if the child was his because she continued to be involved with other men while in a relationship with him. Father reported that mother contacted him in July 2020 to inform him about the birth of the minor and the possibility that he was the

4

biological father.  The report showed that after paternity was established, father initially told the Agency he intended to take custody of the minor; however, father failed to contact the Agency after paternity was established at the October 16, 2020 appointment of counsel hearing and was not responsive to phone calls or text messages for nearly two months.  The Agency reported that the minor's current placement was most suitable and did not recommend any changes.  The Agency reported that offering reunification services to father was not in the minor's best interest because the minor did not have a relationship with, and had never met, father.  The Agency stated that the minor was over the age of one and had been in the same foster home since her release from the hospital and had a strong bond with the family, which was willing to provide permanency to the minor through adoption.

At the December 16, 2020 section 342 subsequent petition hearing, minor's counsel objected to father's visitation request, and the court denied the request and ordered father be present at the next hearing.  Father and mother did not appear at the January 25, 2021 section 342 subsequent petition hearing, and father's counsel did not have a reason for father's absence and requested a continuance.  The Agency opposed a continuance and advised the court that there had been no contact with father since the December 16, 2020 hearing and that father was not answering or returning phone calls.  The court also was reminded that father was present and had been ordered to appear when the hearing was set.  The Agency then informed the court that the section 342 jurisdiction/disposition report was filed and recommended not providing reunification services to father because it would not be in the best interest of the minor.  The court denied the request for a continuance and heard argument from father's counsel, who noted that the establishment of his paternity in this case was delayed because mother named two other men as potential fathers before him, but he nevertheless indicated that he wished to take custody of the minor.

5

The minor's counsel submitted on jurisdiction and disposition and noted that while father was biological, he was never in the minor's life. The Agency argued that it had no knowledge of father's existence and that mother initially provided two other men as possible fathers and the Agency took steps to verify her statements. Mother waited to provide father's name and did not provide any contact information. The Agency argued that efforts were made to obtain information about father, but no identifying information was available because father was not a legal resident and, therefore, no background information such as criminal or Child Protective Services history could be obtained in Mexico or the United States. The Agency stated that it was required to conduct a background check before releasing a minor from protective custody to a parent who was previously unknown in a dependency case. At the conclusion of argument, the court found the allegations in the petition true and noted that father was aware of mother's pregnancy and did not "check on anything else following that."

The Agency's February 8, 2021 supplemental section 366.26 report showed that father was again in contact with the Agency and had stated that he wanted to provide care and permanency for the minor. The report showed that the minor was approximately two years old, had never met father, and did not have a relationship with him. The minor had resided with the prospective adoptive parents since her release from the hospital and looked to them for her "physical, emotional, and other age appropriate care necessary for her healthy development." The minor was "well bonded to her current caregivers and their children and continue[d] to grow and flourish with them." The Agency opined that separating the minor from the prospective adoptive parents would be detrimental to the well-being of the minor. The Agency recommended terminating the parental rights of mother and father with a permanent plan of adoption for the minor.

At the March 18, 2021 contested section 366.26 hearing, the court heard testimony from father. Father testified that he had never met the minor and did not have an established relationship or bond with her. Father's counsel opposed termination of

6

parental rights and argued that he was the third named alleged father and the Agency did not make appropriate efforts to locate him after he was identified.

The court stated that the burden was on the parents to show that it would be detrimental to the minor to be placed for adoption based on the applicable exceptions, and no evidence was presented to establish that any detriment or exceptions applied. It found that the testimony showed there was not a bond between father and the minor, notice had been given as required and reunification services were previously terminated, there was clear and convincing evidence that the minor would likely be adopted, and it was in the minor's best interest to terminate parental rights. The court also found that none of the exceptions provided under section 366.26, subdivision (c)(1) existed and ordered mother and father's parental rights terminated with the minor placed for adoption. In addition, the court found that the Agency complied with the case plan and made reasonable efforts, including any steps necessary to finalize the permanent plan for the minor.

Mother and father each filed a timely notice of appeal.

DISCUSSION

On appeal, mother and father challenge the termination of their parental rights, arguing that the court did not conduct a proper paternity inquiry under section 316.2. We disagree.

The juvenile court has a duty to determine the parentage of a child. (*In re Jesusa V.* (2004) 32 Cal.4th 588, 665.) To that end, under section 316.2, subdivision (a), the juvenile court has a mandatory duty to interrogate mother and other appropriate people about the child's father in an effort to determine the parentage of minors who are before the court due to petitions filed under sections 300, 601 or 602. "The inquiry shall include at least all of the following, as the court deems appropriate: (1) Whether a judgment of paternity already exists[;] (2) Whether the mother was married or believed she was married at the time of conception of the child or at any time thereafter[;]

7

(3) Whether the mother was cohabiting with a man at the time of conception or birth of the child[;] (4) Whether the mother has received support payments or promises of support with respect to the child or in connection with her pregnancy[;] (5) Whether any man has formally or informally acknowledged or declared his possible paternity of the child, including by signing a voluntary declaration of paternity[;] (6) Whether paternity tests have been administered and the results, if any[; and] (7) Whether any man otherwise qualifies as a presumed father pursuant to Section 7611, or any other provision, of the Family Code." (§ 316.2, subd. (a); Cal. Rules of Court, rule 5.635.)

Section 316.2, subdivision (b) provides: "If, after the court inquiry, one or more men are identified as an alleged father, each alleged father shall be provided notice at his last and usual place of abode by certified mail return receipt requested alleging that he is or could be the father of the child. The notice shall state that the child is the subject of proceedings under Section 300 and that the proceedings could result in the termination of parental rights and adoption of the child. [A JV–505 form] shall be included with the notice. Nothing in this section shall preclude a court from terminating a father's parental rights even if an action has been filed under Section 7630 or 7631 of the Family Code."

As the Supreme Court noted in *In re Zacharia D.* (1993) 6 Cal.4th 435: "While under normal circumstances a father may wait months or years before inquiring into the existence of any children that may have resulted from his sexual encounters with a woman, a child in the dependency system requires a more time-critical response. Once a child is placed in that system, the father's failure to ascertain the child's existence and develop a parental relationship with that child must necessarily occur at the risk of ultimately losing any 'opportunity to develop that biological connection into a full and enduring relationship.' [Citation.]" (*Id*. at p. 452.) Here, father contends "the court acknowledged the identity of the baby's father was unknown and yet failed to question mother about any and all potential alleged and presumed fathers."

8

Father's contention rests on the provisions of section 316.2. Subdivision (a) of that section requires the juvenile court to conduct an inquiry "as to the identity and address of all presumed or alleged fathers." However, the court's duty in this regard arises *only* "[i]f the local child support agency states, or if the court determines through statements of the parties or other evidence, that there has been no prior determination of parentage of the child . . . ." (Cal. Rules of Court, rule 5.635(e).) Here, at the June 2019 detention hearing, both mother and S.D. asserted that he was the minor's father and that he had signed a declaration of paternity. Once it was determined that S.D.'s name was not on the birth certificate and a signed declaration of paternity was not produced, paternity testing was ordered. No other names were provided for possible fathers. After S.D. was excluded as a possible father, the court made another inquiry regarding paternity. Mother then named L.B. as a possible father, but he was excluded on January 21, 2020. During this hearing, with all parties present, the court then inquired, "And do we have any other candidates as possible father?" The Agency responded, "Not that the mother has told us at this time." The court therefore did not cover all elements of the section 316.2, subdivision (a) inquiry on the record at this time. It was not until March 2020, when mother's reunification services were terminated, that she first named father as the possible father of the minor. However, mother indicated she did not have any contact information to assist the Agency in locating father. As a result, in March 2020, the Agency filed an absent parent locator, which did not return any results for father, and sought and obtained an order to publish notice to father and any unknown father in the local newspaper, which was published in June 2020. The Agency informed the court at the July 2020 section 366.26 hearing that mother was able to contact father. Father thereafter appeared in the dependency proceedings.

This record does not support a finding that the juvenile court failed to conduct a paternity inquiry at the outset of the case. The court was presented with mother and S.D. both claiming S.D.'s paternity; S.D. was present for the birth of the minor, in a

9

relationship with mother at that time, and claimed that he had signed a declaration of paternity. The court found he was the alleged father in the interim until a declaration of paternity or the birth certificate could be obtained. While father argues there was an error in the court's minutes from this first appearance in June 2019 stating that the "parents [were] ordered to reveal the names and location of absent parents, maternal and paternal relatives" when this was not part of the hearing transcript, even if this assertion were credited, the juvenile court's duty of inquiry arises only "[i]f the local child support agency states, or if the court determines through statements of the parties or other evidence, that there has been no prior determination of parentage of the child . . . ." (Cal. Rules of Court, rule 5.635(e).) A voluntary declaration of paternity "establishes the parentage of a child and has the same force and effect as a judgment of parentage by a court." (Cal. Rules of Court, rule 5.635(c); Fam. Code, § 7573.) The court reasonably expected mother and S.D. to submit a formal declaration of paternity based on their relationship and representations during the hearing and allowed them time to do so before making an inquiry. Accordingly, we disagree with father that a duty of inquiry arose at the time of the first hearing.

We agree with father, however, that a duty of inquiry arose after S.D. was excluded as the father or, at minimum, after L.B. was named and excluded as a possible father. Following L.B.'s exclusion, the court did inquire of the mother and the Agency at the January 21 hearing whether there were other possible candidates for the minor's father, but failed to undertake the full inquiry pursuant to section 316.2, subdivision (a). To that point, father further argues "the court improperly delegated to the [Agency] the responsibility to ask mother about any alleged fathers" after S.D. was excluded. We conclude, however, that any error in the court's inquiry into paternity was harmless.

To the extent the trial court erred in failing to adequately perform its duty to inquire as to the identity of minor's father, timely notice of the early proceedings was not given to father and his initial appearance in the matter was delayed. Where an alleged

10

father does not receive the requisite notice, we must determine if the lack of notice was prejudicial. (See *In re Paul H.* (2003) 111 Cal.App.4th 753, 762.) Lack of notice is subject to the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]. (*In re Angela C.* (2002) 99 Cal.App.4th 389, 394.) The California Constitution provides: "No judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of pleading, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) In the context of dependency proceedings, even due process violations have been held subject to the harmless beyond a reasonable doubt standard of prejudice. (See *In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1121-1123 [noncompliance with notification requirements of section 316.2]; *In re Angela C., supra*, at p. 395 [inadequate notice of the termination of parental rights hearing]; *Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, 1386-1388 [denial of contested permanency planning hearing]; *In re Dolly D.* (1995) 41 Cal.App.4th 440, 446 [denial of right to confront and cross-examine witnesses]; *In re Laura H.* (1992) 8 Cal.App.4th 1689, 1696 [absence of parent's attorney during examination of minor in termination of parental rights proceeding]; *In re Monique T.* (1992) 2 Cal.App.4th 1372, 1377 [parent's waiver of rights].) Here, we find no prejudice.

The record shows the Agency repeatedly inquired of mother regarding possible parentage, but when mother finally disclosed father's name, its attempts to locate father in March 2020 were fruitless, likely due to the fact that he was not a lawful resident, has a common name, frequently changed his residence, and mother did not provide any contact information for him. The record shows that despite knowing mother was pregnant when their relationship ended, father did not maintain contact with mother in order to establish paternity or a relationship with the child. It is unclear from the record how mother ultimately made contact with father and advised him about the dependency case and

11

whether she hid his contact information from the Agency or simply did not have current contact information for him. There is no indication in the record that the court could have succeeded in locating father earlier had it made more inquiries directly to mother in accordance with section 316.2, subdivision (a), rather than relying on the Agency and mother's counsel. Indeed, many aspects of the statutory inquiry were not applicable in this case or would not have yielded information about father. No judgment of paternity already existed; mother was not married; she was not cohabiting with father at the time of the minor's birth; it was S.D. who informally acknowledged or declared his possible paternity of the child; and no paternity tests were administered until after mother's successive disclosures of possible paternity. (See § 316.2, subd. (a).) Accordingly, the statutory areas of inquiry most likely to be fruitful were whether mother received any support or promises of support during pregnancy and whether any other man qualified as a *presumed* father. (See § 316.2, subd. (a).) On the former issue, despite having an opportunity, the record does not suggest that mother ever told the Agency or the court about any support or promises thereof. In fact, mother shared nothing except father's name after the first two candidates were excluded. And while father asserts this failure deprived him of the opportunity to qualify as a presumed father, we conclude that any error was harmless because he failed to seek presumptive father status after appearing in the proceedings and he would not qualify as a presumed father even if the court had conducted an appropriate inquiry and father was notified earlier in the proceedings.

Following notice, father did appear at the October 16, 2020 appointment of counsel hearing, and the court found he was the biological father of the minor based on the paternity testing results. However, his biological father status did not grant him the rights or status of a presumed father, who is entitled to custody and reunification services. (See *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 595-596.) Father was notified of the section 342 subsequent petition hearing and ordered to be present but failed to attend. Father's counsel gave no reason for his absence. He also failed to

12

maintain contact with the Agency or respond to calls.  At no time did father bring a section 388 motion seeking the court's reconsideration of its earlier rulings based on new evidence or changed circumstances establishing his entitlement to reunification services and presumptive father status.  (*In re Zacharia D., supra*, 6 Cal.4th at p. 442; *In re Eric E.* (2006) 137 Cal.App.4th 252, 258.)

In addition to his failure to seek presumptive father status once his biological paternity was established, defendant did not meet the criteria for this status.  Under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, a presumed father is an unwed biological father who "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial and otherwise." (*Id.* at p. 849.)  "From the precise language used by the court in *Kelsey S.* and as demonstrated by the holding in the later Supreme Court case of *Adoption of Michael H.* (1995) 10 Cal.4th 1043 (*Michael H.*), there are at least two elements of 'full commitment':  (1) a demonstration of a willingness to financially support the child and (2) a willingness—at least to the extent she makes possible—to emotionally support the unwed mother during her pregnancy." (*Adoption of T.K.* (2015) 240 Cal.App.4th 1392, 1394, italics omitted.)  "This is so because 'the mere existence of a biological link does not merit . . . constitutional protection' [citation]; rather, the federal Constitution protects only the parental *relationship* that the unwed father has actively developed by ' "com[ing] forward to participate in the rearing of his child" ' [citation] and 'act[ing] as a father' [citation]." (*Michael H., supra*, 10 Cal.4th at p. 1052, original italics.)  Father would not have qualified as a *Kelsey S.* father.  He admitted he knew mother was pregnant, and while he claims he initially offered support, he also claimed he was uncertain if the child was his because mother wanted to pursue other relationships.  He took no further steps to offer financial or emotional support during the pregnancy or confirm whether mother had the baby and whether the baby was his child.  As the juvenile court found, father was initially aware of mother's pregnancy and did not "check on anything else following that."  While father's actions after birth

13

were at times more diligent than his actions before birth, the Supreme Court has held that a parent cannot compensate for his lack of demonstration of a " 'full commitment' to parenthood during pregnancy . . . by attempting to assume his parental responsibilities [after birth or] many months after learning of the pregnancy." (*Michael H., supra*, 10 Cal.4th at p. 1054, italics omitted; *id*. at pp. 1054-1055.)

Accordingly, we conclude that any deficiencies in the notice by the juvenile court and Agency were harmless beyond a reasonable doubt.

DISPOSITION

The orders of the juvenile court are affirmed.


      KRAUSE      , J.


We concur:


      BLEASE      , Acting P. J.


      DUARTE      , J.